(Lorain Co., O., Court of Common Pleas.)

THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY V. THE CLEVELAND, BEREA, ELYRIA & OBERLIN RAILWAY COMPANY, AND THE OBERLIN & ELYRIA ELECTRIC RAILWAY COMPANY.

Section 3, of the act of the legislature, passed April 27th, 1896, (92 V., 315 Bates Rev. Stat., sec. 247f.), requires the railroad company hereafter seeking to cross the track of another railroad company at grade, to inter-lock or attach together the tracks at said crossing in such manner as shall be prescribed by the commissioner of railroads and telegraphs.

Said section does not require the railroad company seeking to cross another railroad at grade to put in an "inter-locking system."

(Decided January 8, 1898.)

NYE, J.

The plaintiff, The Lake Shore & Michigan Southern Railway Company, brings its action against the defendants to enjoin the defendants from crossing the plaintiff's track on East College street, in the village of Oberlin.

The plaintiff, as a ground for said injunction, says, that said defendants are not putting in said crossing in accordance with the laws of the state of Ohio, and especially it claims that said defendants are attempting to put in said crossing in violation of the provisions of sec. 3, of an act of the legislature, passed April 27, 1896, (92 V., 316, Bates Rev. Stat., sec. 247f.), which section the plaintiff claims requires the defendants to put in and maintain at the defendant's expense, what is known among railroad men as an inter-locking system and signals, at the point of said crossing.

The defendants on the other hand admit that they are about to cross the track of The Lake Shore and Michigan Southern Railway Company at the point named; but they deny that they are attempting to cross said track in violation of the laws of Ohio, or in violation of said section 3 above referred to.

On the contrary the defendants claim that they are attempting and were about to put in a crossing at said point, such as has been prescribed by the Commissioner of Railroads and Telegraphs.

The defendants further say by their answer that they submitted this question to the Commissioner of Railroads and Telegraphs of Ohio, and that on the 10th day of December 1897, said commissioner prescribed the kind of crossing that they should put in at said point, and the defendants set forth in their answer a copy of the order of the railroad commissioner of said date, which is as follows:

"The Elyria & Oberlin Electric Railway's track shall be provided with a derail on each side of the tracks of the Lake Shore & Michigan Southern Railroad, said derails to be placed not closer than thirty-five (35) feet of the steam railroad, and to be connected by a stiff connection, to a lever placed on the opposite side of the tracks of The Lake Shore & Michigan Southern Railroad, in such a manner, that before the car of The Elyria & Oberlin Electric Railway, can pass over the tracks of the Lake Shore & Michigan Southern Railroad, the conductor of the Elyria & Oberlin Electric Company's car shall be compelled to cross the tracks of the Lake Shore & Michigan Southern Railroad, and close the derail by operating lever. The lever and derail shall be so constructed that the normal position of the derail shall at all times be at danger, and so that it will return to the normal position immediately on release of lever by conductor. Furthermore, the said lever shall be provided with a positive locking device, such as will render it impossible for the lever to be operated after a train or engine on the Lake Shore & Michigan Southern Railroad, has reached a point two thousand 2,000) feet distant from the said crossing in either direction.

"Furthermore, the Elyria & Oberlin Electric Company's road, shall be provided with a signal placed one hundred (100) feet from the steam road, on each side, which signal shall normally indicate safety, but which shall indicate danger to the motorman of the electric railway at all times when there is a train or engine within 2,000 feet of the crossing on the main or high speed track.

"Furthermore, the Elyria & Oberlin Electric Railway, shall put in such size and weight of crossing frogs, as will conform to the rails in use in the tracks of the Lake Shore & Michigan Southern railroad tracks, and shall put them in to the satisfaction of the said Lake Shore & Michigan Southern railroad.

"The Elyria & Oberlin Electric Railway Company, shall pay all costs of material and construction of the aforesaid crossing and safety devices, and shall pay for all future maintenance of the same, as provided in sec. 3, House Bill 108.

"The aforesaid safety devices shall be put in to the satisfaction and be subject to the approval of the commissioner of rail-

roads and telegraphs for the state of Ohio, and must be accepted by him before it shall be put into operation, and must be finished within ninety days from date.

"If in the future the conditions should be such that in the opinion of the aforesaid commissioner of railroads and telegraphs for the state of Ohio, further protection is necessary, or, in the case the Elyria & Oberlin Electric Railway should desire to run over the crossing without stopping, then, in that case, the crossing shall be further protected by such inter-locking device as the commissioner shall direct, and the aforesaid Elyria & Oberlin Electric Railway Company, shall, as in the first case, pay all cost of construction and future maintenance.

"Witness my official signature this tenth day of December, A. D., 1897.

"R. S. KAYLER, Commissioner.

"Attest: E. H. ARCHER, Chief Clerk."

The defendants further say, that the crossing, frogs and appliances provided for by them for said crossing, and which they are about to place on said crossing, correspond in all respects with the order of said commissioner of railroads and telegraphs.

Upon the trial of this case, the plaintiff's attorneys claimed that this entire question depends upon the construction to be placed upon sec. 3, of said act of April 27, 1896.

The general counsel for said road, in arguing said case, expressly said, that he did not desire to oppose the defendant's crossing the road of the plaintiff; but he did desire that if the defendants did cross the road of the plaintiff, they should do so in such manner as is required by the statutes of Ohio, so that it could not be said that the plaintiff was guilty of any breach of duty in voluntarily permitting said defendants to cross plaintiff's road in a manner not provided by the laws of the state of Ohio.

The defendants' attorneys claimed that the plaintiff should not maintain this action, for four reasons:

First: Because the defendant companies at the point of inter-section of the two tracks in controversy, are street railroads, and not electric railroads.

Second: That if the defendants are electric railroads, the matter of the manner of crossing the plaintiff's railroad, is entirely in the hands of the commissioner of railroads and telegraphs.

Third: That the Lake Shore & Michigan Southern Railway Company cannot maintain this action; but that the same should be brought and maintained, if at all, by some public officer.

Fourth: That the act under consideration is unconstitutional.

In deciding this case, I propose to let my decision largely turn upon the construction which I shall place on sec. 3, of said act of April 27, 1896. (Sec. 247f, Bates' Rev. Stat.)

I shall, however, pass upon some of the other questions made by the attorneys in arguing the case.

Section 1, of the act under consideration (sec. 247d, Bates' Rev. Stat.), provides, that when "two or more railroads, or a railroad and an electric railroad, crossing each other at a common grade, or any railroad crossing a stream by a swing or draw bridge, shall, by a system of inter-locking, or by other works or fixtures * * * render it safe for engines or trains to pass over such crossing or bridge, without stopping, and such system of inter-locking, works or fixtures shall first be approved by the commissioner of 'railroads and tellegraphs,'" it is made lawful for the engines and trains of such railroad or railroads, to pass over such crossing or bridge without stopping.

Section 2, (sec. 247e, Bates' Rev. Stat.,) provides that "where the tracks of two or more railroads,, or the tracks of a railroad and electric railroad cross each other at a common grade in this state, any company owning any one of such tracks, whose managers may desire to unite with others in protecting such crossing with interlocking or other safety devices, and shall be unable to agree with such others on the matter, may file with the said commissioner a petition stating the facts of the situation, and asking said commissioner to order such crossing to be protected by interlocking or other safety devices."

This section further provides for a hearing before the commissioner, and the commissioner may refuse to require such interlocking system, or he may grant the prayer of said petition and prescribe the interlocking or other safety devices for such crossing.

We now come to the section specailly under consideration in this case, which reads as follows:

"Sec. 3 (Sec. 247f, Bates Rev. Stat.) In case, however, one railroad company or an electric railroad company shall hereafter seek to cross at grade with its track or tracks the track or tracks of another railroad, the railroad company or the electric railroad company seeking to cross at grade shall be compelled to interlock such crossing to the satisfaction of the said commissioner, and to pay all costs of such appliance, together with the expense of putting them in and the future maintenence and operation thereof: Provided this act shall not apply to crossings of side-tracks only."

I am of the opinion that this section should be examined in connection with the other sections of this act and other sections of the statutes relating to the crossings of railroads at grade.

It will be observed that sec. 1, and sec. 2, of this act provide for a system of inter-locking or other safety devices, whereby trains are allowed to cross tracks of other railroads without stopping, and when those systems have been put in and approved by the commissioner of railroads and telegraphs, the trains of said railroads at said crossing may pass over such crossings without stopping and without being subjected to the penalties and liabilities provided for in section 3333 Revised Statutes.

In sec. 1, of the act under consideration this language is used: "By a system of interlocking or by other works or fixtures," etc.

In the second section of the act under consideration this language is used: "With interlocking or other safety devices."

Section 3333 provides that all trains before crossing over the tracks of another railroad shall come to a full stop. The section then provides that when said railroads "shall by any works or fixtures to be erected by them render it safe to pass over said crossing without stopping, and such works and fixtures shall first be approved by the commissioner of railroads and telegraphs" then and in such case the trains of said railroads are not required to stop, at said crossings."

It will be observed that in all three of these sections the statute provides that some kind of a system which is to be approved by the commissioner of railroads and telegraphs, shall be put in before trains are allowed to cross over said crossings without coming to a full stop.

In secs. 3333, we do not find the word "interlock" or "interlocking" used.

In sec. 1 and 2, of the act under consideration the word interlocking is used in connection with a safety device, and not otherwise.

In sec. 3, it will be observed that the railroads named therein "shall be compelled to interlock such crossing to the satisfaction of said commissioner."

This then, brings us to the consideration of the question as to what the legislature meant when it used the language as used in this statute, "shall be compelled to interlock such crossing."

We now turn naturally to the meaning of the word "interlock." Webster in his definition of "interlock" says it means "To unite; embrace; communicate with; to flow into one another."

Again, it means "to unite by locking together; to lock one with another."

The Century Dictionary defines "interlock" to be locked together; mutually engaged; clasp or cling; embrace; as the interlocking boughs of a wood."

"To lock or clasp together to lock or hitch one in another as cattle sometimes interlock their horns."

These seem to be the usual and accepted meanings of the word "interlock," and I have every reason to believe that in the use of said word, the legislature intended to use it in its usual and ordinary sense.

Now, I have come to the conclusion that when the legislature said, as in sec. 3, of the act under consideration, that the railroad hereinafter seeking to cross another railroad "shall be compelled to interlock such crossing to the satisfaction of said commissioner," means no more than that the railroad attempting to cross the track of another railroad shall make such a connection with the other railroad as is approved by the commissioner of railroads and telegraphs.

In other words, it shall lock or unite the two tracks together at the crossing to the satisfaction of said commissioner.

It does not and cannot, in my opinion, mean that the railroad attempting to cross another railroad at grade shall put in an interlocking system or other safety device; but it simply means that it shall make such interlocking or crossing of the tracks as it approved by the commissioner of railroads and telegraphs, and nothing more.

I have examined several books on railroading and railroad mechanics, and in none of them have I been able to find that the word "interlock" means any more among railroad men than the common and accepted definition of the word. But when the term "interlocking system", or the term "interlocking signals and switches" is used, then the term has a broader meaning as is clearly indicated in the first and second sections of the act under consideration.

In the discussion of this case, I am of the opinion that counsel have given to the word "interlock" or the expression "shall be compelled to interlock such crossing," a very much broader meaning than was intended by the legislature when it enacted said section.

And in my opinion, counsel upon both sides of this case in the argument of it have unintentionally, and perhaps unconsciously read into this section "an interlocking system" instead of reading the section as it really and truly is written, when it says that the railroad "shall be compelled to interlock such crossing to the satisfaction of said commissioner."

I am therefore of the opinion that since the commissioner of railroads and telegraphs has prescribed the manner in which said crossing shall be constructed, that the plaintiff and defendants are both bound by the decision of said commissioner, and therefore the injunction prayed for in this petition should be refused.

Although I have arrived at the conclusion stated from an examination and construction of the statute under consideration, I do not desire to leave this case without a further statement upon this question of an interlocking system.

Evidence was given upon the trial of this case by Mr. Handy, the chief engineer of The Lake Shore and Michigan Southern Railway Company, with reference to what he considered a perfect interlocking system, whereby one train may cross the track of another without stopping; and it is such a system as the plaintiff company claims that the defendants should erect and maintain at the crossing in question under sec. 3, of the act under consideration.

Now, I do not understand that all interlocking systems are alike, nor that all interlocking systems would be approved by the commissioner of railroads and telegraphs of Ohio; but the statute provides, that before the trains running upon the track of one railroad shall cross the track of another railroad without stopping, the system used

shall be approved by said commissioner.

I find in the Century Dictionary this definition of "interlocking system of signals in railroading: "Any system or devices whereby signals denoting the positions of switches at stations, junctions, and bridges are by means of locking mechanism connected with and controlled by the switch mechanism in such manner that any movement of the switches operates the proper signal to indicate to engine drivers and others the position in which the switch is set."

"Various systems have been introduced, and they have added greatly to the safety of modern railway traffic."

So that if the contention made here by the plaintiff is that the defendants should put in an interlocking system, it is not such a system as might be agreeable to the plaintiff; but such a system as would meet "the satisfaction of said commissioner." And in one sense, the system already prescribed by the commissioner of railroads and telegraphs for the crossing in controversy, is a system of signals denoting the position of the rails and crossing at the point in controversy.

In the Engineering News of Sept. 12th, 1895, (Vol. 34, p. 161), a device very similar to the one prescribed by the commissioner of railroads and telegraphs for the crossing in question, is described, and is designated as "A Simple Interlocking System for grade Crossings."

A very valuable article on the subject of "Railway Signaling" by W. McGrafton, civil engineer, is found in the Bulletin of the University of Wisconsin, Engineering Series, Vol. 1, pp. 147 to 184, which treats of this whole subject of interlocking systems and signals.

An examination of the literature of railroad men and railroad civil engineers, convinces me that an "interlock" is an entirely different thing from an "interlocking system" or "interlocking signals."

Under the system prescribed by the commissioner of railroads and telegraphs, the Lake Shore trains are not required to stop, nor is their track cut as would be required by the interlocking system described by chief Engineer Handy.

But on the other hand, the track of the defendant companies only is cut on both sides of the track of the Lake Shore road, and the defendant companies are required to look out for trains and see that no collision occurs at the point of crossing.

Having come to the conclusion that I have announced in reference to this case, I do not care to go at length into the other questions raised in argument upon the trial of this case, further than to announce my conclusion upon certain propositions made and discussed by counsel. With reference to these I desire to say that I am of the opinion that under the statutes and charter of the defendants, the defendants are Electric Railroad Companies.

I am further of the opinion that The Lake Shore & Michigan Southern Railway Company has such an interest in the preservation of its tracks and road-bed that it has a right to maintain an action, to prevent them from being cut unlawfully.

As to the constitutionality of this section, I will simply say, that to the extent that said section requires that the defendants "shall be compelled to interlock such crossing to the satisfaction of the said commissioner, and to pay all costs of such appliances" that said section is constitutional. A decree will therefore be entered for the defendants.

E. G. Johnson and Geo. C. Green, Atty's. for Plaintiff.

Wilcox, Collister, Hogan & Parmely, and Kline, Carr, Tolles & Goff, Atty's. for Defendants.